2006 OK 23

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Franklin J. PACENZA, Respondent.**

**SCBD No. 4983.**

Supreme Court of Oklahoma.

April 18, 2006.

Rehearing Denied June 13, 2006.

---

Mike Speegle, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

William Hall, Bartlesville, OK, for Respondent.

WATT, C.J.

¶ 1 The complainant, Oklahoma Bar Association (Bar Association), charged the respondent, Franklin J. Pacenza (Pacenza/attorney), with two counts of professional misconduct involving a contract of deed executed between Eric and Tina Richards (collectively, Richards) and the attorney covering real property in Creek County, Oklahoma. The Bar Association alleged that the attorney's actions in regard to the contractual relationship amounted to engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.[1]

¶ 2 Upon a *de novo* review,[2] we hold that clear and convincing evidence [3] supports findings of the attorney's dishonest, fraudu-

---

1. Rule 8.4, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A. The rule also prohibits an attorney from engaging in conduct that is prejudicial to the administration of justice. In addition, the Bar Association contends that the attorney violated: Rule 1.1, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–1 [Requiring competent representation, legal knowledge, skill, thoroughness and reasonable preparation.]; Rule 1.2, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A [Governing a lawyer's scope of representation.]; Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A [Precluding acts contrary to prescribed standards of conduct, whether such acts occur in the course of professional capacity or otherwise.].

2. *State ex rel. Oklahoma Bar Ass'n v. Garrett,* 2005 OK 91, ¶ 17, 127 P.3d 600; *State ex rel. Oklahoma Bar Ass'n v. Anderson,* 2005 OK 9, ¶ 15, 109 P.3d 326; *State ex rel. Oklahoma Bar Ass'n v. Hummel,* 2004 OK 30, ¶ 16, 89 P.3d 1105.

3. Rule 6.12, Rules Governing Disciplinary Procedures, 5 O.S.2001, Ch. 1, App. 1–A.; *State ex rel. Oklahoma Bar Ass'n v. Funk,* 2005 OK 26, ¶ 42, 114 P.3d 427; *State ex rel. Oklahoma Bar Ass'n v. Kessler,* 1995 OK 32, ¶ 23, 895 P.2d 713; *State ex rel. Oklahoma Bar Ass'n v. Downing,* 1993 OK 44, ¶ 11, 863 P.2d 1111.

lent, deceitful and misleading actions resulting in significant economic harm to the Richards, embarrassment to the legal profession and this Court and an undermining of public confidence in the Bar Association and its members. Further, we determine that the respondent's misconduct, not unlike that having occurred in two previous disciplinary proceedings,[4] considered with discipline administered in similar cases [5] and the attorney's unwillingness to acknowledge any wrongdoing warrants a suspension of two years and one day along with the payment of $4,456.41 in costs.[6]

## FACTS

¶ 3 The gravamen of this complaint centers on real property (property) in Creek County. In 1997, Pacenza was hired by Vernon Loveless (Loveless) to foreclose the interest of Fred Monachello (Monachello) in the property for failure to meet the terms of a note and mortgage. The property consisted of approximately eight acres and an uncompleted "shell" home. Pacenza was successful in getting judgment against Monachello and the property was offered at a sheriff's sale. Loveless appeared at the sale, bidding two-thirds of the appraised price. However, the bid money was never paid and no sheriff's deed issued.

¶ 4 On August 25, 1988, the attorney withdrew from the foreclosure action without permission of the trial court and subsequently entered into an agreement with Loveless for purchase of the property.[7] In exchange for a $2,000.00 credit on his attorney fee and payment of $8,000.00, Loveless granted the attorney a general warranty deed, signed on October 2, 1998. The deed was not filed of record until January 2, 2002—**almost three years after Pacenza entered into the contract for deed with the Richards and subsequent to the Richards having brought suit against the attorney for damages.**

¶ 5 In 1999, the Richards saw the property advertised for sale and contacted a local real estate agent who directed them to the property and to Pacenza's office. The Richards were accompanied by Mrs. Richards' sister, Janelle Koontz Massey (Massey/sister), when they went to the attorney's workplace. The same day, February 15, 1999, the Richards executed a contract for deed prepared by the attorney for a total purchase price of $30,000.00. The contract states that Pacenza will provide the Richards with a warranty deed upon payment of the contract price.[8]

¶ 6 The testimony concerning the meeting with Pacenza is conflicting on several points. First, Mrs. Richards and her sister testified that they asked the attorney whether they needed independent legal representation and were told the extra expense would be unnecessary as Pacenza was a "real estate attorney." [9] Initially, Pacenza testified that he

---

**4.** See, ¶¶ 22 and 28 and accompanying footnotes, infra.

**5.** In crafting discipline, we seek to make it consistent with that imposed upon lawyers who have committed similar acts. *State ex rel. Oklahoma Bar Ass'n v. Bolusky*, see note 48, infra; *State ex rel. Oklahoma Bar Ass'n v. Braswell*, 1998 OK 49, ¶ 7, 975 P.2d 401.

**6.** Rule 6.16, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

**7.** Loveless has filed no complaint against Pacenza regarding the foreclosure and subsequent sale of the property. Therefore, we express no opinion regarding these facts as they may relate to Rule 1.8, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A prohibiting a lawyer's acquiring a proprietary interest in the cause of action or subject matter of litigation.

**8.** The contract for deed, executed on February 15, 1999, provides in pertinent part at ¶ 9:

"... Upon the payment of all the purchase price herein set forth, together with all interest and other moneys due by virtue of this contract, first party agrees to make, execute and deliver to the second parties, a good and sufficient warranty deed, conveying the said premises to the second parties and shall deliver to the second parties an abstract of title, showing good and merchantable title in the first party, except for such liens and encumbrances, taxes or other charges as the second parties shall have allowed to accumulate or shall have placed thereon since the date of this contract...."

**9.** Transcript of proceedings, October 25, 2005, Christina Richards testifying in pertinent part at pp. 106–07:

"Q I need you to tell this trial panel as best you can remember what Mr. Pacenza did tell you.
A Well, my sister asked if we needed to talk to another attorney or anything, and Mr. Pa-

didn't recall whether the Richards asked if they should seek independent legal advice. Subsequently, he stated that there may have been "some discussion" about the Richards getting an attorney but that he didn't tell them not to see another legal advisor.[10] Nevertheless, the attorney did admit that he may well have made some representations that he does real estate work.[11]

¶ 7 Mrs. Richards stated that her sister specifically asked the attorney whether the title was free and clear and that Pacenza responded affirmatively.[12] She also testified

cenza kind of got up and he said well, I'm a real estate attorney, that's what I do, and talked about how we could carry a contract with him. We thought that was great, and so he—it was only a few minutes and he went out and talked to his secretary and he said we can have everything drawn up today, it will be just a few minutes, and it was, it was just a few minutes, and he came back and he had this paper with him.
Q   Did you ask him if you needed to have an attorney look at this?
A   Yes. My sister asked that.
Q   What did he say?
A   He said he was a real estate attorney and that's what he did and he said he could save us some money by him doing the contract...."
Transcript of proceedings, October 25, 2005, Janelle Massey testifying in pertinent part at p. 218:
"... [A]nd one of the questions *I asked him was did they need to get an attorney or someone to stand in their behalf and to look over the paperwork, and he assured us over and over again that he was a real estate attorney, he had just gone through all the paperwork on the place during the repossession and had brought the title opinion up to date and everything was current and he was a real estate attorney and he would take care of everything with the house and he was very qualified. I think one of his comments was that's what I do ...."

10.  Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at pp. 403–04:
"... Q   They didn't ask you if they needed somebody to look at this deed and to look at this to see if the title was good; they didn't ask you that?
A   Not that I recall....
Q   But you do understand that your testimony is directly opposed to her testimony, is that correct, and the trial panel is going to have to decide who they're going to believe in this case; do you understand that?
A   No. I don't believe that's so. Again, there may have been some discussion about them

that the attorney did not disclose: the existence of $300,000.00 in IRS tax liens against the property; title problems existing as a result of the incomplete foreclosure action; or that she and her husband could only expect a merchantable title upon the payment of cash in hand to the attorney.[13] Massey acknowledged that Pacenza mentioned there were some back taxes owed on the property. Nevertheless, she stated that he assured the Richards that their $500.00 deposit money and the additional $4,500.00 they placed with him would take care of bringing the taxes up

getting a lawyer, but did I tell them not to get a lawyer, absolutely not...."

11.  Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 407:
"... Q   So it didn't happen this way like she said, like she testified to?
A   It didn't happen exactly the way she said, no. Now, I very well may have made some representations that I do real estate work, but that's different from saying I'm a real estate attorney and I'm an expert. I've never called myself an expert in any field of law ever to anybody...."

12.  Transcript of proceedings, October 25, 2005, Christina Richards testifying in pertinent part at p. 106:
"... Q   What concern, if any, did you have about making sure that the title was okay?
A   We had specifically asked if the title—my sister asked if the title was free and clear, if there was anything that needed to be taken care of, and everything came to be fine through Mr. Pacenza, what he had told us...."

13.  Transcript of proceedings, October 25, 2005, Christina Richards testifying in pertinent part at p. 108:
"... Q   Did Mr. Pacenza say anything about a $300,000 federal income tax lien against the property?
A   Never.
Q   Did Mr. Pacenza tell you that there was a foreclosure that was partially completed and that it was not in fact completed and that the tithe was—there was some problems with the title because of the foreclosure not being completed?
A   Never.
Q   Did Mr. Pacenza ever tell you that if you found a buyer later on, that you would have to come up with cash before he would clear the title up?
A   No, sir...."

to date.[14] If she had been aware of the $300,000.00 in IRS tax liens and the incomplete foreclosure action, Massey testified that she would have advised the Richards to forego entering the contract for deed.[15]

¶ 8 Before the trial panel, Pacenza admitted that he did not disclose the existence of the $300,000.00 in IRS tax liens because he did not believe the liens attached to his interest in the real property.[16] Furthermore, he acknowledged that he was fully aware of the condition of the title when the contract for deed was entered.[17] He also stated that if he had been in the Richards' position he would

have wanted a title opinion and knowledge of whether the property was subject to an incomplete foreclosure action.[18] Nevertheless, the attorney does not believe that he did anything wrong or out of order in the real estate transaction.[19]

¶ 9 The couple invested countless hours of time and hard work and thousands of dollars in improvements to the real property.[20] The Richards first realized there might be title problems when they decided to move and to sell their interest. They received an offer from a couple, the Clingnenpeels. The Rich-

---

14. Transcript of proceedings, October 25, 2005, Janelle Massey testifying in pertinent part at pp. 218–19:

"... A  The questions that I had made note of were in regard to taxes. Mr. Pacenza stated that there was some back taxes owed on it. He found that in doing the title opinion, and with the deposit that Tina and Eric were going to give him, he would bring the taxes up to date, and that's why he needed the deposit from them, and he would take care of recording the deed, the contract for deed and take care of everything...."

This testimony is confirmed by Mrs. Richards statements before the trial panel. Transcript of Proceedings, October 25, 2005, Christina Richards testifying in pertinent part at p. 130:

"Q  Why did the sale not go through, if you know?
A  Frank—every time we would try and sit down and talk to him about the property, he said, well, before you can sell it, I have a couple of tax things I need to clear up, and we had brought up the fact that we had given him $5,000 front money to clear up any of the tax things, and he said, well, it's just taking a little bit more time ..."

15. Transcript of proceedings, October 25, 2005, Janelle Massey testifying in pertinent part at p. 230:

"... Q  Had you known there was an almost $300,000 federal income tax lien plus a foreclosure that had been started on the property and improperly completed at the time that contract was signed, what would you have advised them to do?
A  I'd have told them to run as fast as possible in the other direction...."

16. Transcript of proceedings, November 16, 2006, Franklin J. Pacenza testifying in pertinent part at p. 397:

"... Did you tell them that there were almost $300,.000 worth of tax liens against this property?
A  No ...
Q  But that had attached to the property; would you agree with me on that?

A  No. It only attached to Mr. Monachello's interest in the property ..."

17. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 429:

"... Q  I'm asking you if you knew what the title problems on that property were when you sold this to Eric and Tina Richards?
A  I believed I was aware of the condition of the title at that time...."

18. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at pp. 437–38:

"... Q  Would you want to know whether there was foreclosure that was not completed?
A  I would do a title opinion....
Q  And you would want to know whether or not there was an incomplete foreclosure on the property?
A  That's right...."

19. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 441:

"... Q  Do you see anything that you did wrong or out of order in this real estate transaction with the Richards whenever you prepared this contract for deed and they were in your office and signed it?
A  No....
Q  And your position is you didn't do anything wrong in this case; is that correct?
A  That's correct...."

20. Transcript of proceedings, October 25, 2006, Janelle Masey testifying in pertinent part at p. 219:

"... We just took what we were told and presented and didn't realize there was any encumbrances or any problems until Tina and Eric had to sell the property after doing thousands of dollars worth of work and repairs and upgrades and then found out there was all kind of problems...."

ards approached Pacenza with an offer from the prospective buyers who wanted to take over the payments the Richards were making on the contract for deed and buy out their equity. Apparently, this occurred sometime before Christmas of 2000. Although Pacenza agreed to this arrangement and promised to have the paperwork completed before the holiday, he kept putting the transfer off stating that he had some tax problems to clear up on the property. When Christmas, the first of the year and several other weeks passed without the title problems having been addressed, the Clingenpeels withdrew their offer.

¶ 10 A second offer was made on the property on April 20th of 2001. The Richards and Hattie Bruchfield (Burchfield) negotiated a "cash contract" in which the purchaser agreed to accept the property in "as is" condition.[21] It was at this time that the Richards first learned about the full extent of the cloud on their title.[22] When they ap-

proached Pacenza with this information, he told them that he didn't know what they were talking about but that he would take care of the existing title problems. These assurances continued for approximately two months.[23] When Mrs. Richards attempted to contact the attorney concerning their financial stress and the problems they were having in paying for their schooling and medical bills for their infant son, the attorney told her not to call in the future because she "was wasting his money by answering the phone."[24]

¶ 11 After the Richards had no success in working with Pacenza to clear up the title problems, they hired a lawyer, Stephen Schuler (Schuler), to represent them in August of 2001. When Schuler contacted Pacenza on the Richards' behalf, he was told that Pacenza would remedy the title problems by filing the requisite documents to complete the foreclosure and to dispose of the IRS tax lien situation within a two week time frame.[25]

21. The Contract of Sale of Real Estate was signed on April 20, 2001. Page 5 of the contract provides in pertinent part:
"... SPECIAL CONDITIONS.
THIS IS A CASH CONTRACT.
BUYER AGREES TO ACCEPT PROPERTY IN 'AS IS' CONDITION...."
Complainant's exhibit 17, Deposition of Hatie Burchfield taken on August 22, 2003, providing in pertinent part at p. 15:
"... Q And I think as I recall under the contract or agreement or understanding if the sale had been concluded you intended to pay cash at that time?
A Right...."

22. Transcript of proceedings, October 25, 2005, Christina Richards testifying in pertinent part at pp. 135–36:
"... MS. PRUITT: ... If you would, Miss Richards, just answer the question of what title problems were determined to exist at that time.
A We found out that it wasn't—I don't know how to say it in legal terms, but we found out that Frank didn't own the property, so neither did we was our understanding of what Tim Kramer has showed us and that there was $300,000 worth of tax liens...."

23. Transcript of proceedings, October 25, 2005, Christina Richards testifying in pertinent part at pp. 137–38:
"... Q Tell the trial panel what basically you said to him and he said back to you as best you remember. I know it's been a long time ago.

A We told him what Tim Kramer told us, and he assured us that he had no idea what we were talking about basically, except there had been a few title problems, and he would take care of that.
Q And how long did that assurance that he would take care of that continue roughly approximately?
A It took another couple of months...."

24. Transcript of proceedings, October 25, 2006, Christina Richards testifying in pertinent part at pp. 140–41:
"... Q Can you describe that, please?
A We had gotten Maverick—that's my little boy's name. We had gotten him home, and because he has been in intensive care, he had to be fed a bottle and I was trying to breast feed him and having quite a few problems getting him not used to the bottle and used to nursing. So we were having quite a few difficulties with that, and we had all these bills due. So I called Frank as I did every week, and he let me have it. He was very angry that I called and bothered him and that I was wasting his time calling him, that he would let me know when he heard something, and he let me know that I was not to call him anymore because I was wasting his money by answering the phone...."

25. Transcript of proceedings, October 25, 2006, Steven Schuler testifying in pertinent part at p. 76:
"... Q So if Mr. Pacenza's position is that this was good service, then what should he

Sometime during this period, the attorney attempted to get the purchaser to provide him with $7,000.00 to cover the costs of clearing the title.[26] Despite representations made to the potential purchasers and to Schuler that he was in the process of getting the IRS liens expunged and the title cleared, Pacenza took no action. The Richards were forced to file suit based on claims of fraudulent inducement, breach of contract and breach of fiduciary duty.

¶ 12 Schuler turned over the case to one of his associates, Gerald Hilsher. On August 7, 2003, Hilsher was successful in getting a summary adjudication in favor of his clients providing that the Richards', having presented Pacenza with a real estate contract from a cash buyer who was ready, willing and able to purchase the property, placed an obligation on the attorney to produce marketable title.

¶ 13 When the trial date of September 8th was set, Hilscher was approached by Pacenza's attorney who advised him that his clients should take $55,000 in settlement "or else" Mr. Pacenza's wife would file for divorce and Pacenza would file for bankruptcy. The Richards were given a deadline of 4:30 p.m.

on August 25th to make their decision. Hilscher construed this as a threat to place assets available to pay any judgment out of reach.[27] The Richards refused the settlement offer. Within days, Pacenza's wife obtained a waiver divorce with an agreed settlement in which she received the couple's nonexempt property and Pacenza retained the exempt property. Immediately thereafter, the attorney filed bankruptcy. The trustee in bankruptcy filed an adversary proceeding alleging that Pacenza had made fraudulent transfers in advance of the bankruptcy filing. Pacenza admitted that one motivation behind the divorce proceeding was to preserve assets.[28]

¶ 14 On September 2, 2003, Hilsher filed the instant complaint with the Bar Association on his and the Richards' behalf. Subsequently, the adversary bankruptcy proceeding was settled with no finding of fraud being entered. While the Richards estimated their total out of pocket expenses at $116,265.25, Hilscher estimated that the Richards could have recovered a judgment for as much as $300,000.00 to $400,000.00 plus attorney fees and costs had they gone to trial against Pacenza.[29] Nevertheless, as a part of the

have done whenever you called upon him to remedy the situation and he told you he would do that within two weeks?
A I was assuming from my conversation with him that he would file the requisite documents to dispose of the federal tax liens and to resolve the question of whether there had been a sale and the disposition of that sheriff's sale and foreclosure...."

26. Transcript of proceedings, November 16, 2005, Gerald Hilsher testifying in pertinent part at p. 262:

"... Part of the discussion in the deposition of Mr. Pacenza was, well, when I get the money, I can make the title. In fact, part of the discussion between Burchfield, at the time of the attempted sale by the Richards, was that if he got $7,000 out of the proceeds of the sale from somebody, that he would have enough money to go cure all of these problems, and Burchfield wasn't about to give him $7,000 to get clear title that he had the obligation to clear under his contract with the Richards...."

27. Transcript of proceedings, October 16, 2005, Gerald Hilsher testifying in pertinent part at pp. 280–81:

"... We had a September 8th trial date.... At the deposition of Ms. Burchfield before it began, Mr. Hall said to me that his client had advised him to tell me that my clients should take a $55,000 offer that he was making or else Mr. Pacenza's wife would file for divorce; he would file for bankruptcy. What that meant to me in that context was that if we didn't take that settlement offer, that through the means of the divorce and the bankruptcy, he would place any assets available to pay any judgment out of reach...."

28. Complainant's exhibit 16, Trustee's Examination of Frank Pacenza, November 12, 2003, providing in pertinent part at p. 41:

"... Q ... So one motivation for this divorce proceeding was to preserve assets?
A Absolutely...."

29. Transcript of proceedings, November 16, 2005, Gerald Hilsher testifying in pertinent part at p. 356:

"... Q So is it reasonable to say that the claims asserted by the Richards could easily— the claim could have amounted to hundreds of thousands of dollars?
A I think the claim could easily have amounted to $300, $400,000, plus attorney fees on top of that...."

settlement, the Richards received $53,000.00 from Pacenza, plus $5,000.00 that had been in their attorney's trust account minus expenses and attorney fees of approximately $22,000.00.[30] In exchange, the Richards agreed to deed the property back to Pacenza and to provide a letter to the Bar Association stating that all issues regarding the contract for deed with Pacenza had been resolved. Pacenza asserted that the Richards did not comply with this portion of the bankruptcy settlement. Nevertheless, the letter, along with a copy of the bankruptcy settlement, was mailed to the Bar Association on July 28, 2004.[31]

¶ 15 At the hearing before the trial panel on November 16, 2005, Pacenza had little recall of his prior two incidences of discipline or of his deposition testimony given during the proceedings before the trial and bankruptcy courts. He did not recall that Christina Richard's sister had been present when the contract for deed was executed. Nevertheless, he did remember that he hadn't told the Richards of the $300,000.00

IRS tax liens against the property[32] or that the foreclosure action was incomplete.[33] He also remembered several facts involving the transactions with the Richards which he was unable to testify to when his deposition was taken on May 1, 2002. Pacenza was also able to recall that he had been at the sheriff's sale governing the foreclosed property—a fact which eluded him in his 2002 deposition. The attorney was also confused on why he had requested that he be provided $7,000.00 during the time period in which he was attempting to clear the title for the Burchfield sale—he couldn't remember whether he intended to utilize the money to settle the IRS tax liens or to complete the foreclosure. One fact of which Pacenza was certain was that he had done nothing wrong in his dealings with the Richards[34]—his position being that he sold the property to them as an "individual" rather than as an attorney.[35] Furthermore, he stated that he did nothing more to clear the title to the real property because he was "mad" at the Richards and didn't intend to do anything for them.[36]

---

30. By the time Pacenza discharged his debts, the Richards had ultimately received between $39,000.00 and $40,000.00. Transcript of proceedings, November 16, 2005, Gerald Hilsher testifying in pertinent part at p. 293.

31. The letter, signed by Gerald L. Hilsher and dated July 28, 2004, provides in pertinent part:

    "... This letter is to advise you that the litigation between the Richards and attorney Pacenza has been settled, pursuant to the terms of the settlement agreement reached through the efforts of U.S. Bankruptcy Judge Tom Cornish, as settlement judge, and that all issues concerning the Richards and attorney Pacenza have been resolved...."

32. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 397:

    "... Q Did you tell them that there were almost $300,000 worth of tax liens against this property?
    A No ..."

33. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 400:

    "... Q Did you tell them that you filed a foreclosure on this property but you had not completed it?
    A As far as I was concerned, the foreclosure was completed...."
    Contradictory testimony appears on p. 401 where Pacenza states that he doesn't recall either

way whether he told the Richards about the foreclosure proceedings.

34. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 441:

    "... Q Do you see anything that you did wrong or out of order in this real estate transaction with the Richards whenever you prepared this contract for deed and they were in your office and signed it?
    A No....
    Q And your position is that you didn't do anything wrong in this case; is that correct?
    A That's correct...."

35. Complainant's Exhibit 15, deposition of Frank Pacenza, taken on May 1, 2002, providing in pertinent part at p. 77:

    "... Q. Do you feel that as an attorney with specialized knowledge in real estate matters that you owed these two lay people some kind of warning, some kind of direction to seek their own attorney's advice and to obtain a title opinion before entering into a Contract for Deed with you?
    A When I sold them this property, I sold it as an individual. I didn't sell it to them as an attorney...."

36. Transcript of proceedings, November 16, 2005, Franklin J. Pacenza testifying in pertinent part at p. 518–19:

    "... MR. LEMONS: I have a couple of questions, I believe that it was in response to the

¶ 16 The trial panel report, filed on January 19, 2006, recommends that Pacenza be suspended for six months and ordered to pay the costs of the proceeding. In making this recommendation, the trial panel recognized that clear and convincing evidence existed that Pacenza: concealed material information relating to the title to the real property; misrepresented the need for curative title actions; failed to advise the Richards to seek independent legal representation; and made misrepresentations to the Richards and to their attorneys concerning his attempts to clear title to the real property. The trial panel found Pacenza's responses to questions during the proceeding to be evasive, inconsistent and misleading.

¶ 17 The Bar Association's application to assess costs of $4,546.41 was filed on January 24, 2006. The brief in chief, in which the Bar Association argues for a suspension in excess of six months and the imposition of costs, followed on February 13th. Pacenza filed his response on March 6th. The briefing cycle was completed on March 7, 2006, with the Bar Association's filing of a waiver.

### JURISDICTION AND STANDARD OF REVIEW

■ ¶ 18 We stress that it is this Court's nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law—the duty is vested solely in this department of government.[37] Discipline is administered to preserve public confidence in the bar. Our responsibility is not to punish but to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts and of the legal profession. Discipline is imposed to maintain these goals rather than as punishment for the lawyer's misconduct.[38] Disciplinary action is also administered to deter the attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts.[39] Discipline is fashioned to coincide with the discipline imposed upon other lawyers for similar acts of professional misconduct.[40] Although this Court strives to be evenhanded and fair in disciplinary matters, discipline must be decided on a case-by-case basis because each situation involves unique transgressions and mitigating factors.[41]

■ ¶ 19 We review the evidence *de novo*[42] to determine if the allegations of misconduct are established by clear and convincing evidence.[43] The Bar Association's com-

---

question of why didn't you take the action that you otherwise probably should have taken to get clear title to this property, and at some point your answer was I was mad at them. A Right....
MR. LEMONS: I, too, have been sitting here through all of this wondering because it seems so simple. So why did you do it? It was because you were mad?
A You know, these are the kind of people I'm dealing with. I'm not going to do anything for them...."

37. *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 50, infra; *Tweedy v. Oklahoma Bar Ass'n*, 1981 OK 12, ¶ 4, 624 P.2d 1049

38. *State ex rel. Oklahoma Bar Ass'n v. Phillips III*, 2002 OK 86, ¶ 21, 60 P.3d 1030; *State ex rel. Oklahoma Bar Ass'n v. Bedford*, see note 56, infra; *State ex rel. Oklahoma Bar Ass'n v. English*, 1993 OK 68, ¶ 12, 853 P.2d 173; *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 17, 642 P.2d 262.

39. *State ex rel. Oklahoma Bar Ass'n v. Bedford.*, see note 56, infra; *State ex rel. Oklahoma Bar Ass'n v. Badger*, 1995 OK 113, ¶ 13, 912 P.2d 312; *State ex rel. Oklahoma Bar Ass'n v. Hall*, 1977 OK 117, ¶ 12, 567 P.2d 975.

40. *State ex rel. Oklahoma Bar Ass'n v. Patterson*, 2001 OK 51, ¶ 29, 28 P.3d 551; *State ex rel. Oklahoma Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 0, 914 P.2d 644; *State ex rel. Oklahoma Bar Ass'n v. Bolton*, 1994 OK 53, ¶ 16, 880 P.2d 339.

41. *State ex rel. Oklahoma Bar Ass'n v. Doris*, 1999 OK 94, ¶ 38, 991 P.2d 1015; *State ex rel. Oklahoma Bar Ass'n v. Rozin*, 1991 OK 132, ¶ 10, 824 P.2d 1127.

42. *State ex rel. Oklahoma Bar Ass'n v. Garrett*, see note 2, supra; *State ex rel. Oklahoma Bar Ass'n v. Anderson*, see note 2, supra; *State ex rel. Oklahoma Bar Ass'n v. Hummel*, see note 2, supra.

43. Rule 6.12, Rules Governing Disciplinary Procedures, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Funk*, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Kessler*, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Downing*, see note 3, supra.

plaint contained two counts. The first dealt with the misrepresentations made to: the Richards; the parties attempting to purchase the real property from the Richards; and the Richards' attorneys. The second rested on Pacenza's divorce, property settlement and bankruptcy filings.

¶ 20 The trial panel did not determine that Pacenza's divorce, property settlement or bankruptcy filings were instigated for the purpose of fraudulently placing them outside the realm of assets which might be subject to the Richards' suit filed in the district court. The Bar Association makes no recommendation for discipline on this count in the brief in chief. The settlement reached in the bankruptcy proceeding is devoid of any mention of Pacenza having acted fraudulently. There is evidence that the divorce and the bankruptcy may well have been filed for the purpose of preserving assets.[44] Nevertheless, on the record presented, the evidence does not rise to the clear and convincing standard necessary for the imposition of discipline.

¶ 21 In contrast, the evidence is overwhelming and—in some instances unrefuted—that from the time the Richards first walked into Pacenza's office in early 1999, through the attempts to sell their real property interest in 2001 and 2002, in the district court action instigated to protect the Richards' financial investment and before the trial panel, the attorney engaged in dishonest, fraudulent, deceitful and misleading actions resulting in significant economic harm, embarrassment to the legal profession and this Court and an undermining of public confidence in the Bar Association and its members. Furthermore, this is not a situation in which the sole testimony against the attorney is presented by dissatisfied parties. Rather, condemning evidence came in through the testimony of two attorneys who attempted to right the wrongs to which the Richards had been subjected. Such testimony is given great weight.[45]

**44.** See ¶ 13 and accompanying footnotes, supra.

**45.** See, *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 46, infra.

## PACENZA'S PREVIOUS MISCONDUCT

¶ 22 Pacenza was privately reprimanded by this Court in October of 1987, for engaging in conduct involving misrepresentations and deceit arising from his collusion in removing a client's child from the lawful custody of the minor's father and transporting the mother and child from Texas to Oklahoma.[46] On February 24, 1989, the Professional Responsibility Commission administered a private reprimand for misrepresentations he made to a social worker at the Oklahoma Department of Human Services that he had filed suit on behalf of an individual and expected to settle the suit within six months— when no lawsuit had been filed and the attorney was aware that there was no settlement forthcoming.

## PACENZA'S ARGUMENTS IN DEFENSE OF DISCIPLINE

¶ 23 Besides his assertions that there is no clear and convincing evidence of his misdeeds, the attorney relies on four theories as complete defenses to the imposition of any discipline: 1) the lack of an attorney-client relationship between himself and the Richards; 2) that, despite the title defects, the contract for deed was sufficient to transfer his interest to the Richards; 3) the failure of the Richards to present him with "the coin of the realm" or cash in hand negating the requirement for him to present marketable title; and 4) the Richards letter to the Bar Association stating that all matters underlying the complaint had been resolved. None of these arguments are viable or convincing.

¶ 24 The lack of an attorney-client relationship between Pancenza and the Richards is immaterial. Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A clearly provides that a lawyer committing any act contrary to prescribed standards of conduct, **whether in the course of professional capacity, or otherwise,** may be grounds for discipline. The principle is dem-

**46.** The private reprimand is considered particularly lenient. Similar conduct resulted in a one year suspension in *State ex rel. Oklahoma Bar Ass'n v. Holden*, 1995 OK 25, 895 P.2d 707.

onstrated by Oklahoma case law.[47] It is also unimportant whether the parties agree that a particular ethical violation occurred. This Court is not limited to analyzing those ethical standards recognized or cited by the complainant and the respondent nor by those charged in the complaint.[48]

¶ 25 Pacenza asks us to ignore his responsibility to act honestly as a practitioner of the bar. Essentially, the attorney asserts that he should be absolved of culpability on the misrepresentation count because a contract for deed may legally be entered when the conveyor of the property has no interest and that only if the Richards' presented him with cash in hand did he have any duty to clear the title. We will not reach the underlying legal arguments made by Pacenza. In disciplinary matters, we not only determine the lawyer's continued fitness to practice law, but we must do so while safeguarding the interests of the public, the courts, and the legal profession.[49] We cannot perform this function and allow the kind of mental jockeying that Pacenza proposes.[50]

¶ 26 Pacenza is convinced that the portion of the bankruptcy settlement resulting in the Richards being awarded damages and requiring a letter to the Bar Association stating that the underlying cause has been resolved should absolve him of discipline. Such is not the case under either the disciplinary rules [51] or the bar disciplinary opinions of this Court.[52]

## ENHANCEMENT, MITIGATION AND APPROPRIATE DISCIPLINE

¶ 27 The trial panel recommended a six-month suspension and the payment of costs. The Bar Association request a "lengthy suspension" and asserts that the facts and the attorney's disciplinary history support a suspension in excess of the recommended six month period. This Court is the ultimate decision maker concerning attorney discipline and is not bound by the trial panel's findings, recommendation and conclusions.[53]

**¶ 28 It is significant that this third occasion for discipline involves the same type of misconduct as that which was encompassed within the prior two offenses—dishonesty, fraud, deceitfulness and misleading actions.** Patterns of misconduct factor in tailoring the appropriate discipline for a lawyer's misdeeds.[54] This Court takes seriously the indifference of attorneys to their wrongdoing [55] and focuses

47. *State ex rel. Oklahoma Bar Ass'n v. Flanery,* 1993 OK 97, 863 P.2d 1146 [Recognizing that there had been no lawyer-client relationship between the attorney and the injured parties and that all the conduct complained of occurred before the attorney was licensed.]; *State ex rel. Oklahoma Bar Ass'n v. Raskin,* see note 38, supra [Recognizing that procedures against a dishonest lawyer need not rest upon the injured party's complaint and that jurisdiction lies even in causes where the complaint did not originate with the client of the accused attorney.]; *State ex rel. Oklahoma Bar Ass'n v. Brandon,* 1969 OK 28, 450 P.2d 824 [Conduct occurring before the individual became an attorney—and in which there was no attorney-client relationship—was sufficient to suspend the attorney under disciplinary rules substantially similar to Rule 1.3, Rules Governing Disciplinary Proceedings, see note 1, supra.].

48. *State ex rel. Oklahoma Bar Ass'n v. Bolusky,* 2001 OK 26, ¶ 8, 23 P.3d 268; *State ex rel. Oklahoma Bar Ass'n v. Caldwell,* see note 60, infra; *State ex rel. Oklahoma Bar Ass'n v. Hummel,* see note 2, supra; *State ex rel. Oklahoma Bar Ass'n v. Bedford,* see note 56, infra.

49. *State ex rel. Oklahoma Bar Ass'n v. Farrant,* see note 50, infra; *State ex rel. Oklahoma Bar*

Ass'n v. Donnelly, 1992 OK 164, ¶ 14, 848 P.2d 543; *State ex rel. Oklahoma Bar Ass'n v. Colston,* see note 60, infra.

50. *State ex rel. Oklahoma Bar Ass'n v. Farrant,* 1994 OK 13, ¶ 13, 867 P.2d 1279.

51. Rule 1.9, Rules Governing Profession Conduct, see note 57, infra; Rule 5.5, Rules Governing Disciplinary Proceedings, see note 57, infra.

52. *State ex rel. Oklahoma Bar Ass'n v. Colston,* see note 60, infra.

53. *State ex rel. Oklahoma Bar Ass'n v. Blackburn,* 1999 OK 17, ¶ 30, 976 P.2d 551; *State ex rel. Oklahoma Bar Ass'n v. Holden,* see note 46, supra; *State ex rel. Oklahoma Bar Ass'n v. McCoy,* 1996 OK 27, ¶ 14, 912 P.2d 856.

54. *State ex rel. Oklahoma Bar Ass'n v. Minter,* see note 60, infra; *State ex rel. Oklahoma Bar Ass'n v. Kessler,* 1991 OK 81, ¶ 16, 818 P.2d 463.

55. *State ex rel. Oklahoma Bar Ass'n v. Butler,* see note 60, infra; *State ex rel. Oklahoma Bar Ass'n v. Busch,* see note 60, infra; *State ex rel. Okla-*

attention on those who prolong or engage in litigation to avoid the consequences of their actions.[56] A lawyer is guilty of gross misconduct when the attorney deceives an individual to the latter's injury and then attempts to limit liability through settlement in exchange for the party's agreement not to pursue a grievance.[57]

¶ 29 Here, the attorney's actions surrounding the contract for deed, his misrepresentations concerning the ability to clear the title and his lack of any attempt to do so demonstrate a deliberate course of dishonest conduct reflecting adversely upon his fitness to practice law. Pacenza's making it necessary for the Richards to bring suit against him to protect their interests and his resultant divorce where non-exempt properties were transferred to his ex-wife requiring the Richards to participate in adversarial proceedings in the bankruptcy court constituted conduct prejudicial to the administration of justice.[58] The series of events, which only the attorney could have altered or controlled, have resulted in significant economic harm—demonstrated by Mrs. Richards testimony that the young family was financially devastated and that, in order to assure that their losses in their relationship with Pacenza did not affect their credit rating, they "missed some meals",[59] embarrassment to the legal profession and this Court and an undermining of public confidence in the Bar Association and its members.

¶ 30 Although the facts of this case are unique in that no strict attorney-client relationship existed between the Richards and the attorney, causes involving attorney misrepresentation along with other factors have garnered two of the most serious of punishments—suspensions of two years and a day and disbarment.[60] There is clear and con-

homa Bar Ass'n v. Wolfe, 1993 OK 84, ¶ 18, 864 P.2d 335. See also, Commentary, Rule 8.4, Rules Governing Professional Conduct, note 1, supra, providing in pertinent part:

"... A pattern of repeated offenses, even ones of minor significant when considered separately, can indicate indifference to legal obligation...."

56. *State ex rel. Oklahoma Bar Ass'n v. Patmon,* 1998 OK 91, ¶ 26, 975 P.2d 860, *cert. denied,* 526 U.S. 1120, 119 S.Ct. 1772, 143 L.Ed.2d 801 (1999), *rehearing denied,* 527 U.S. 1058, 120 S.Ct. 25, 144 L.Ed.2d 828 (1999); *State ex rel. Oklahoma Bar Ass'n v. Bedford.,* 1997 OK 83, ¶ 18, 956 P.2d 148.

57. Rule 1.9, Rules Governing Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A prohibiting a lawyer from making an agreement prospectively limiting the lawyer's liability to a client for the lawyer's personal malpractice or settling a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

See also, Rule 5.5, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A providing:

"Neither unwillingness nor neglect of the person filing the grievance to sign a grievance, or to prosecute a charge, nor the settlement or compromise of the dispute between the person filing the grievance and the lawyer, or restitution by the lawyer, shall of itself require abatement of the processing of any grievance, and the termination of such processing shall be at the sole discretion of the Commission."

*State ex rel. Oklahoma Bar Ass'n v. Colston,* see note 60, infra.

58. Rule 8.4, Rules Governing Professional Conduct, see note 1, supra.

59. Transcript of proceedings, October 25, 2005, Christina Richards testifying in pertinent part at pp. 146–47:

"... Q ... I'm going to ask you to tell the trial panel basically what effect did Mr. Pacenza's actions had on you and your family.... A Pretty much devastated us financially for that whole year that we were trying to sell the property and go to school, and our income for that year was $6,000, and that was a pretty rough year for a new family, and then to have that kind of financial pressure, it was very tough. Q How were you able to recover from that? A We have went on and just done our best to keep our credit good. We went without some meals, but we kept our credit intact, and we were able to keep that going so we could purchase a house in Montana ..."

60. *State ex rel. Oklahoma Bar Ass'n v. Dobbs,* 2004 OK 46, 94 P.3d 31 [Ongoing pattern of deceitful practices warranted disbarment and the payment of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Minter,* 2001 OK 69, 37 P.3d 763 [Attorney before Court for the fourth time and actions displaying a pattern of misconduct suspended for two years and one day and charged with costs.]; *State ex rel. Oklahoma Bar Ass'n v. Spadafora,* 1998 OK 28, 957 P.2d 114 [Conduct involving dishonesty, fraud, deceit or misrepresentation along with other acts of misconduct warranted suspension of two years and one day along with payment of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Bedford,* see note 56, supra [Attorney

vincing evidence [61] that Pacenza was dishonest with the Richards when the contract for deed was executed, with the Clingenpeels, Burchfield and the Richards during the attempted sale of the real estate and with his fellow attorneys when he represented that the title matters were being resolved. Pacenza's conduct is not acceptable nor can it be ignored.

▊ ¶ 31 Private reprimands are not given lightly. Nevertheless, it is apparent that this most lenient of disciplines has not impressed the attorney with the necessity of dealing honestly and forthrightly with the public. Therefore, we must deliver discipline sufficient to persuade the attorney that such conduct will not be tolerated.[62] When previous sanctions have failed to correct errant conduct, this Court, in carrying out its duty to protect the public, has no choice but to substantially increase the severity of the sanction. Anything less and we would be deserting our constitutionally-vested power as overseer of the legal profession.[63]

▊ ¶ 32 Mitigating circumstances may be considered in evaluating both the attorney's conduct and in assessing the appropriate discipline.[64] Nevertheless, there are some matters so serious that mitigating factors will seldom override the requirement of substantial discipline.[65] Finally, offenses against common honesty should be clear, even to the youngest lawyers; and to distinguished practitioners, their grievousness should be even clearer.[66]

▊ ¶ 33 Honesty and integrity are the cornerstones of the legal profession. Nothing reflects more negatively upon the profession than deceit. There can be little doubt that the attorney has brought discredit upon the legal profession. In imposing discipline, the Court evaluates the entire record of an attorney's professional conduct and scrutinizes the record to determine whether the alleged offenses are a mere blotch on an

engaging in deliberate course of dishonest conduct reflecting adversely upon fitness to practice law and engaging in frivolous lawsuit suspended for two years and one day.]; *State ex rel. Oklahoma Bar Ass'n v. Busch*, 1996 OK 38, 919 P.2d 1114 [Disabled attorney charged with neglect and misrepresentation and with a history of three prior disciplinary actions suspended for two years and one day and ordered to pay costs.]; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 46, supra [Two years and a day suspension warranted where attorney engaged in unauthorized practice of law, failed to pay prior awarded costs and made misrepresentations.]; *State ex rel. Oklahoma Bar Ass'n v. Butler*, 1995 OK 89, 903 P.2d 872 [Course of conduct involving concealing of derelictions and refusing to take responsibility warranted disbarment.]; *State ex rel. Oklahoma Bar Ass'n v. Caldwell*, 1994 OK 57, 880 P.2d 349 [Dishonesty, fraud, deceit, misrepresentation and knowing abuse of legal process warrants two years and one day suspension with requirement of application for reinstatement and imposition of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Brown*, 1993 OK 39, 863 P.2d 1108 [Forging judge's signature, showing of no remorse and two private reprimands warranted disbarment and payment of costs.]; *State ex rel. Oklahoma Bar Ass'n v. Colston*, 1989 OK 74, 777 P.2d 920 [Attorney under disability making false representations to clients concerning status of cases and attempting to limit liability to a client by offering settlement in exchange for agreement not to pursue a bar grievance disbarred.]; *State ex rel. Oklahoma Bar Ass'n v. Raskin*, see note 38, supra [Even unblemished record will not hamper disbarment where attorney practices deceit and

neglect, commingling and conversion.]. See also, *State ex rel. Oklahoma Bar Ass'n v. Chappell*, note 69, infra; *State ex rel. Oklahoma Bar Ass'n v. Hensley*, 1983 OK 32, 661 P.2d 527; *State ex rel. Oklahoma Bar Ass'n v. Ablah*, 1959 OK 267, 348 P.2d 172.

61. Rule 6.12, Rules Governing Disciplinary Procedures, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Funk*, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Kessler*, see note 3, supra; *State ex rel. Oklahoma Bar Ass'n v. Downing*, see note 3, supra.

62. *State ex rel. Oklahoma Bar Ass'n v. McLain*, 2003 OK 15, ¶ 23, 65 P.3d 281; *State ex rel. Oklahoma Bar Ass'n v. Phillips III*, see note 38, supra; *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1997 OK 55, ¶ 15, 938 P.2d 744.

63. *State ex rel. Oklahoma Bar Ass'n v. Benefield*, 2005 OK 75, ¶ 31, 125 P.3d 1191.

64. *State ex rel. Oklahoma Bar Ass'n v. Southern*, 2000 OK 88, ¶ 35, 15 P.3d 1; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2000 OK 35, ¶ 33, 4 P.3d 1242.

65. *State ex rel. Oklahoma Bar Ass'n v. Wyatt*, 2001 OK 70, ¶ 9, 32 P.3d 858; *State ex rel. Oklahoma Bar Ass'n v. Raskin*, see note 38, supra.

66. *State ex rel. Oklahoma Bar Ass'n v. Raskin*, see note 38, supra.

otherwise untainted career, or just one long series of ethically questionable actions.[67]

¶34 Other than the attorney's testimony concerning his community service, there is little that can be said in mitigation. Pacenza's conduct, his two previous encounters with the disciplinary system and the lack of remorse or acceptance of responsibility[68] along with a complete lack of concern for the Richards,[69] convinces this Court that vindication of the legitimate interests served by Oklahoma's bar disciplinary regime requires the imposition of a suspension of two years and one day together with the payment of costs[70] of $4,456.41.[71]

## CONCLUSION

¶35 While there is evidence that the lawyer has been an active member of the community and has contributed much of his time to society, his failure to disclose the title problems to the Richards when the contract for deed was executed, his lack of honesty with multiple parties concerning his efforts to clear title and his continued refusal to accept responsibility for his actions permeate the records of the disciplinary proceeding, the Richards' lawsuit and the bankruptcy matter. We take patterns of misrepresentation seriously.[72]

¶36 The Court is impressed by the harm caused to the Richards and the damage the attorney's actions must have caused to their public perception of the legal profession as a whole. The rule of law requires substantial disciplinary action. The respondent, Franklin J. Pacenza, is ordered suspended from the practice of law for a period of two years and one day. Pacenza is further ordered to pay costs of the proceedings in the amount of $4,456.41 within thirty days of the date this opinion becomes final.

**RESPONDENT SUSPENDED FOR TWO YEARS AND ONE DAY AND ORDERED TO PAY COSTS OF THE PROCEEDING IN THE AMOUNT OF $4,456.41.**

**ALL JUSTICES CONCUR.**

---

67. *State ex rel. Oklahoma Bar Ass'n v. Dobbs,* see note 60, supra.

68. See, *State ex rel. Oklahoma Bar Ass'n v. Arnold,* 2003 OK 31, ¶19, 72 P.3d 10; *State ex rel. Oklahoma Bar Ass'n v. Wolfe,* 1993 OK 84, ¶18, 864 P.2d 335.

69. See, *State ex rel. Oklahoma Bar Ass'n v. Chappell,* 2004 OK 41, ¶24, 93 P.3d 25 in which a similar attitude was considered as a factor for enhancement of the discipline imposed.

70. Rule 6.16, Rules Governing Disciplinary Procedures, see note 6, supra.

71. A suspension from the practice of law for a period of two years and one day is tantamount to disbarment in that the suspended lawyer must follow the same procedures for readmittance as would a disbarred counterpart. Rule 11.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A. Before an attorney who has been disciplined for more than two years may be readmitted to the practice of law, it must be established that the lawyer's conduct will conform to the high standards required of a member of the Oklahoma Bar. The applicant must present stronger proof of qualifications than one seeking first time admission. Rule 11.4, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch. 1, App. 1–A.

72. *State ex rel. Oklahoma Bar Ass'n v. Spadafora,* see note 60, supra.