OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ABDOVEIS

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. ABDOVEIS
2024 OK 55
Case Number: SCBD-7522
Decided: 06/25/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 55, __ P.3d __

 

 

STATE OF OKLAHOMA ex rel., OKLAHOMA BAR ASSOCIATION, Complainant,
v.
MICHAEL ROBERT ABDOVEIS, Respondent.

ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE

¶0 The Complainant, State of Oklahoma ex rel. Oklahoma Bar Association, charged the Respondent, Michael Robert Abdoveis, with three counts of professional misconduct pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings. The Professional Responsibility Tribunal held a hearing and recommended the Respondent be suspended from the practice of law for six months. We hold there is clear and convincing evidence that the totality of the Respondent's conduct warrants a suspension of his law license for a period of one year. The Respondent is hereby suspended from the practice of law for a period of one year from the date of this opinion and ordered to pay costs as provided herein.

RESPONDENT SUSPENDED FROM THE PRACTICE OF LAW FOR
ONE YEAR; ORDERED TO PAY COSTS

Katherine Ogden and Tracy Pierce Nester, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma, for Complainant.

Michael Robert Abdoveis, pro se.

COMBS, J.:

¶1 On July 13, 2023, the Complainant, State of Oklahoma ex rel. Oklahoma Bar Association (OBA), began proceedings pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings (RGDP), 5 O.S. 2021, Ch. 1, App. 1-A, claiming the Respondent, Michael Robert Abdoveis, has committed certain acts which constitute professional misconduct in violation of RGDP, Rule 1.3[1] (discredit to the profession) and the Oklahoma Rules of Professional Conduct (ORPC), 5 O.S. 2021, Ch. 1, App. 3-A, Rules 1.1[2] (competence), 1.3[3] (diligence), 1.4[4] (communication), 3.2[5] (expediting litigation), 3.3[6] (false statement to tribunal), 8.4 (c) and (d)[7].

I. FACTS AND PROCEDURAL HISTORY

¶2 The Respondent, Abdoveis, is an active member of the OBA in good standing. Approximately eight months after passing the bar examination he began employment with Catholic Charities of Eastern Oklahoma (Catholic Charities) as a staff attorney. He was employed from approximately April 2015 until he resigned in July 2021. His main area of work was helping clients of Catholic Charities with immigration issues. Robert Messerli was the supervising attorney and direct supervisor of the Respondent. Messerli was replaced as the supervising attorney in October 2020 by Catie Coulter[8] after a series of complaints had been made by clients of Catholic Charities against Abdoveis. Pending disciplinary proceedings have also been initiated against Messerli relating to his work at Catholic Charities.

¶3 After becoming Abdoveis' direct supervisor, Coulter implemented a management system to help Abdoveis manage his cases. However, in June 2021, Coulter was contacted by an upset client who had worked with Abdoveis. The client alleged Abdoveis falsely represented he had filed the client's husband's application to become a Lawful Permanent Resident of the United States. Coulter spoke with Abdoveis who admitted he had failed to be diligent in many cases. He remained with Catholic Charities for the week to provide Coulter with his notes and information to help Catholic Charities determine the status of the cases. He then resigned his position effective July 2, 2021. Thereafter, Coulter hired Nancy Cardoza, an immigration attorney and former attorney for Catholic Charities, to audit Abdoveis' files. Cardoza discovered approximately nineteen cases wherein Abdoveis failed to diligently pursue his client's matters, misrepresented the status of the case to his clients, and failed to timely submit required filings. Eighteen of these incidents are presented in Count I of the Complaint. Coulter filed a bar grievance and informed the OBA details of the various cases which she believed warranted reporting. She noted that in each case the client is undocumented, and their daily stress and fear of deportation was quite heavy and noteworthy. Abdoveis responded to the grievance and admitted to all of her allegations. Two other grievances for similar misconduct were filed by Abdoveis' former Catholic Charities clients; Elvira Camaja and Renaldo Pacheco. These grievances are in Counts II and III of the Complaint.

¶4 The OBA filed its Complaint on July 13, 2023. The Complaint was sent by certified mail to Abdoveis' current OBA roster address[9] which was returned "unclaimed." Thereafter, the OBA hired a private process server which personally served Abdoveis on August 3, 2023. Abdoveis failed to file a responsive pleading within twenty days as required by Rule 6.4, RGDP.[10] The OBA moved to have all allegations in the Complaint deemed admitted which was granted by the Professional Responsibility Tribunal (PRT) on September 7, 2023.

¶5 On October 5, 2023, the PRT held a one-day hearing. The OBA presented six witnesses[11] and twenty exhibits.[12] Abdoveis attended pro se and testified but presented no witnesses or exhibits. The PRT presented its report on November 13, 2023. It held that Abdoveis violated Rules 1.1, 1.3, 1.4, 3.3, and 8.4 (c) and (d), ORPC and Rule 1.3, RGDP[13] and noted that the question for the panel was not whether Abdoveis engaged in conduct sufficient for professional discipline, but what would be the proper "punishment for his conduct." It determined Abdoveis: fully accepted his responsibility and showed humility and shame; actively assisted Catholic Charities to identify cases in which he was guilty of neglect or fabrication; did not receive adequate training in how to manage his caseload and was supervised by an individual who himself is facing disciplinary proceedings; had no prior discipline and in his present legal position, he posed no danger to the public. These factors weighed in favor of showing "compassion" for Abdoveis, however, the PRT stated "the sheer volume [of] cases in which Respondent committed misconduct and neglect cannot be ignored." It also noted that Abodveis did not refute the charges against him other than the allegations that the guardianship he filed in Elvira Camaja's case was improper, which was asserted by the attorneys for the University of Tulsa Legal Clinic (Kaitlyn Mortazavi and Robin Sherman) who now represent Elvira Camaja. The PRT recommended that Abdoveis be suspended from the practice of law for a period of six months and he be ordered to pay costs.

¶6 The OBA filed its Brief-in-Chief on December 4, 2023, and an Application to Assess Costs in the amount of $2,746.52. It again raised all the rule violations mentioned in its Complaint and admitted by Abdoveis. Abdoveis filed a response brief admitting the allegations and agreeing to a six-month suspension. He indicated his remorse and accepted full responsibility for his actions. For the purpose of mitigation, he only mentions that he had spoken once to Coulter about his caseload being overwhelming and that he needed to not accept new cases but he was denied because other attorneys were not accepting new consultations at that time. He states that this left him without much control over his caseload.

II. STANDARD OF REVIEW

¶7 In Bar disciplinary proceedings, this Court possesses exclusive original jurisdiction. State of Oklahoma ex rel. Okla. Bar Ass'n v. Holden, 1995 OK 25, ¶ 10, 895 P.2d 707, 711. Our review of the evidence is de novo in determining if the Bar proved its allegations of misconduct by clear and convincing evidence. State of Oklahoma ex rel. Okla. Bar Ass'n v. Bolusky, 2001 OK 26, ¶ 7, 23 P.3d 268, 272. Our goals in disciplinary proceedings are to protect the interests of the public and to preserve the integrity of the courts and the legal profession, not to punish the offending lawyers. State of Oklahoma ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31, ¶ 15, 212 P.3d 1186, 1192. The trial authority's findings nor its assessments of the weight or credibility of the evidence bind this Court. State of Oklahoma ex rel. Okla. Bar Ass'n v. Eakin, 1995 OK 106, ¶ 8, 914 P.2d 644, 648. When a respondent fails to answer a complaint, the charges shall be deemed admitted, except evidence shall be submitted for the purpose of determining the discipline to be imposed. Rule 6.4, RGDP. Even when the charges are deemed admitted, this Court will impose discipline only upon finding that clear and convincing evidence demonstrating the misconduct was presented. State of Oklahoma ex rel. Okla. Bar Ass'n v. Clark, 2023 OK 27, ¶ 10, 527 P.3d 708, 712. Clear and convincing evidence is that measure or degree of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Id.

III. ANALYSIS

A. 1. COUNT I of the Complaint (Coulter Grievance).

¶8 At the hearing, Coulter and Cardoza testified concerning Count I of the Complaint. Exhibits were entered as evidence that listed the cases in which Abdoveis failed to diligently pursue his client's causes, misrepresented the status of the cases to his clients, and failed to timely submit required filings. In the matter concerning his client M.M.M., Abdoveis fabricated a receipt from the U.S. Citizenship and Immigration Services (USCIS) stating that they had received his client's form and were currently processing his case. This fabricated document was also entered as an exhibit as well as a grievance response from Abdoveis admitting to the allegations made by Coulter. Based upon the information provided by Coulter, Count I of the Complaint identifies and describes eighteen examples of misconduct Abdoveis committed against his client's as follows:

A. T.J.F. Respondent represented T.J.F. in her application for a provisional waiver which would lead to obtaining Lawful Permanent Status. T.J.F. signed the application on April 11, 2017, but Respondent failed to file same. As a result of Respondent's failure to file the application, T.J.F. was significantly delayed in her ability to have a social security number, a work authorization, a driver's license, and a bank account. This delay also impacted her ability to travel outside of the United States.

B. M.M.M. Respondent represented M.M.M. in his application to adjust status to Lawful Permanent Resident. M.M.M. started the case in September 2017. Respondent falsely represented to M.M.M. that he filed the application on October 7, 2020, and created a fraudulent receipt notice from the United States Citizenship and Immigration Services (USCIS). Respondent never filed the application. As a result of Respondent's actions, M.M.M. lacks an immigration status and work authorization to financially support himself and care for his sick wife.

C. B.D.R. Respondent represented B D.R. in his application for provisional waiver which would lead to him obtaining Lawful Permanent Resident status. Respondent began representation in February 2019 and falsely represented to his client that he had filed said application. B.D.R. suffered a significant delay in the ability to obtain a work authorization and the ability to pursue his education and career.

D. S.I.W. S.I.W. hired Respondent to adjust her status to Lawful Permanent Resident status in July 2019. Respondent falsely represented to S.I.W. that he had filed the application. Respondent's conduct caused a significant delay in S.I.W.'s case.

E. J.A.D.A. Respondent represented J.A.D.A. beginning in March 2017 in his application to obtain a provisional waiver (ultimately leading to him obtaining Lawful Permanent Resident status). Respondent falsely represented to J.A.D.A. that his application was filed. Respondent's conduct caused a significant delay in J.A.D.A.'s case.

F. L.A.M. Respondent represented L.A.M. beginning in March 2016 in her I-130 Petition for Alien Relative. After an initial delay in the filing of the matter, Respondent filed the Application in May 2019. USCIS sent a Request for Evidence that neither Respondent nor the client received. After receipt of a Decision to deny L.A.M.'s application in August 2020, Respondent timely filed an appeal based on the non-receipt of the Request for Evidence. This appeal was rejected with a notice dated December 4, 2020. Respondent falsely represented to his client that he re-filed L.A.M.'s application. Respondent's conduct caused a significant delay in L.A.M.'s case.

G. T.G.R.G. Respondent represented T.G.R.G. beginning in April 2017 in her I-130 Petition for Alien Relative. Respondent failed to file her application. Respondent's conduct caused a significant delay in T.G.R.G.'s case.

H. R.L.C. Respondent represented R.L.C. beginning in January 2017 in his application to adjust status to Lawful Permanent Resident. In March 2020, Respondent admitted to his client that he had yet to file the application and updated it at that time. Thereafter, Respondent failed to file the application. Respondent's conduct caused a significant delay in the processing of R.L.C.'s case.

I. G.B. Respondent represented G.B. beginning in July 2016 in her I-130 Petition for Alien Relative. Respondent falsely represented to G.B. that he had filed her application. Respondent's conduct caused a significant delay in the processing of G.B.'s case.

J. M.A.Y.M. Respondent represented M.A.Y.M. beginning in April 2021 in her application to renew her Deferred Action for Childhood Arrivals (DACA) application. M.A.Y.M.'s OACA status was set to expire June 2021. Respondent failed to file M.A.Y.M.'s application, causing a lapse in her employment authorization (and employment).

K. C.J.T.N. Respondent represented C.J.T.N. beginning in April 2017 to renew his DACA application. Respondent did not file the renewal within one year of his DACA expiration, causing C.J.T.N. to file for DACA as if it was the first time. At the time of his DACA expiration, USCIS was not adjudicating initial DACA applications (only renewals); therefore, C.J.T.N. lost his DACA status permanently or until there was a change in the law. Respondent represented C.J.T.N. again in January 2021 when DACA applications were able to be filed again. Respondent prepared the application in March 2021, but Respondent failed to file same. In July 2021, USCIS again stopped adjudicating initial DACA applications. As a result of Respondent's failure to be diligent, C.J.T.N. lost his deferred action status and work authorization (and income) since 2017.

L. M.G.C.M. Respondent represented M.G.C.M. beginning in April 2020 in her application for a U-visa. Respondent obtained the law enforcement certification for M.G.C.M. on April 6, 2020, but failed to file for the U-visa. Respondent's conduct caused a significant delay in the processing of M.G.C.M.'s case.

M. K.A.B.V. K.A.B.V. entered the country in 2016 as an unaccompanied child and ultimately hired Respondent to seek asylum beginning in June 2019, approximately one month after her 18th birthday. One must seek asylum within one year of entering the country. However, K.A.B.V. was arguably eligible for a special provision allowing unaccompanied minors to file after the one year deadline, but before they turn 18, or within a reasonable time after turning 18. Respondent prepared the asylum application for K.A.B.V. dated July 2019, but failed to file same. Respondent's conduct caused a significant delay and uncertainty regarding K.A.B.V.'s immigration status and her application may only move forward if an ineffective assistance of counsel claim against Respondent is successful.

N. S.J.S.S. S.J.S.S. entered the country on August 7, 2017, and consulted with Respondent on April 26, 2018, to seek asylum. S.J.S.S. signed the application in May 2018, but Respondent never filed same. The one-year deadline to file asylum has passed. Respondent's conduct caused a significant delay and uncertainty regarding S.J.S.S.'s immigration status and her application may only move forward if an ineffective assistance of counsel claim against Respondent is successful.

O. O.C.P. O.C.P. initially consulted with Respondent seeking asylum in March 2017. Although Respondent prepared the application, he failed to file same. O.C.P. turned 18 on September 13, 2021, and because this case was identified in Catholic Charities' audit, another attorney in the office was able to submit O.C.P.'s application prior to her 18th birthday.

In 2019, O.C.P. was a victim of child abuse by her faither. These new facts qualified her to apply for Special Immigrant Juvenile Status (SIJS) - an application with a much higher success rate than asylum. Despite O.C.P.'s mother informing Respondent of these facts, he failed to do anything with the information. As a result of Catholic Charities' audit of Respondent's cases, O.C.P.'s eligibility for this status was discovered eleven days prior to O.C.P. turning 18 and Catholic Charities filed the necessary underlying court dockets to qualify.

P. E.P.S. Respondent represented E.P.S. beginning in March 2017 to apply for SIJS. Though Respondent filed the initial required underlying court documents, he failed to complete a final order. This was not discovered until E.P.S. was 20 years old - two years after she aged out of SIJS eligibility. E.P.S. is no longer eligible for any immigration benefit and is likely subject to a removal order at her next hearing.

Q. Y.O.M. Respondent represented Y.O.M. beginning in September 2016 while he was in removal proceedings. Respondent identified that Y.O.M. was eligible for SIJS and filed the initial required underlying court documents but failed to complete a final order. This was not discovered until Y.O.M. was 20 years old - two years after he aged out of SIJS eligibility. Y.O.M. is no longer eligible for any immigration benefit and is likely subject to a removal order at his next hearing.

R. I.M.S. Respondent represented I.M.S. beginning in July 2020 to renew his DACA application. Respondent failed to file same within the deadline and as a result, I.M.S. would need to file an initial DACA application. Initial DACA applications are presently enjoined by a Texas court and as a result of Respondent's conduct, I.M.S. is living in the United States undocumented.

¶9 The OBA alleges clear and convincing evidence established Abdoveis repeatedly neglected his client's immigration matters and, in many instances, misrepresented the status of the cases to the clients to their legal detriment. We hold the OBA has met its burden and established by clear and convincing evidence that Abdoveis' violated Rules 1.3, 1.4, 3.2, 8.4 (d), ORPC and Rule 1.3, RGDP, regarding Count I of the Complaint. As to 8.4 (c), we have held that in order to violate this rule the "declarant [must have] an evil or bad intent for misrepresenting facts to his client." State ex rel. Okla. Bar Ass'n v. Loeliger, 2005 OK 79, ¶19, 127 P.3d 591, 596. We determined a lawyer's misrepresentations to his clients for the purpose of self-preservation and to avoid discipline showed the requisite improper motive to violate this rule. Id. Here, Abdoveis' own testimony confirms he misrepresented facts of his failure to perform the work he was hired to do in order to protect himself; this included the fabrication of a fraudulent document. We hold the OBA also established by clear and convincing evidence that Abdoveis violated rule 8.4 (c), ORPC, regarding Count I of the Complaint.

2. COUNT II of the Complaint (Camaja Grievance).

¶10 Elvira Camaja engaged the services of Catholic Charities to obtain a "green card" and "juvenile visa."[14] Abdoveis handled her case and sought Special Immigration Juvenile Status (SIJS). However, in order to be eligible for this status, federal law requires her to obtain an order granting her relief from parental abuse, neglect, abandonment, or similar basis under state law, and the relief cannot have been sought primarily to obtain an immigration benefit.[15] In order to satisfy this requirement, Abodveis met with Elvira and her brother and filed an emergency guardianship petition to place Elvira under the guardianship of her brother. The District Court of Tulsa County held a hearing on the petition and Elvira appeared by telephone. The court entered an order granting the emergency guardianship on March 15, 2021, but noted it would expire on March 21, 2021, when Elvira turned 18 years of age; thus, the guardianship was only for a period of less than one week. The only grounds relevant to the SIJS in the order was that Elvira was neglected by her parents because she had not received appropriate education, citing 10A O.S. Supp. 2020, § 1-1-105 (49)(a)(1).[16] It determined that reunification with one or both of her parents was not viable because of this neglect. In addition, the order specifically stated that the guardianship was necessary in order for the "minor child" to petition the USCIS for Special Immigration Juvenile Status. Upon obtaining the order, Abdoveis submitted Elvira's I-360 Petition for SIJS to the USCIS on March 18, 2021, and attached a copy of the order. On September 20, 2021, the USCIS responded with a Request for Evidence for more information relating to the I-360 petition, i.e., the factual basis for the court's determination that it would not be in the best interest of Elvira to return to Guatemala. The Request for Evidence stated that without this factual basis it could not determine whether her primary purpose in seeking the guardianship was to obtain relief from parental maltreatment or to obtain an order for immigration purposes, which is prohibited. Abdoveis testified that the SIJS benefit was later denied after the USCIS requested more information (all of which took place after Abdoveis resigned from Catholic Charities).

¶11 Elvira filed a grievance with the OBA on January 28, 2022. She alleged that Abdoveis "did not explain very well to me about the juvenile visa and the green card. He did not ask me questions." She explained that she would call Abdoveis and he did not respond to her calls. Elvira testified at the PRT hearing that Abdoveis told her she would get her visa within 30 days but after 30 days she could not reach him. She finally sent a message to him on his personal phone on or around August 25, 2021, and found out he no longer worked for Catholic Charities. She eventually sought help from attorneys Kaitlyn Mortazavi and Robin Sherman at the University of Tulsa Legal Clinic.

¶12 At the PRT hearing Mortazavi testified that she attempted to withdraw Elvira's petition for SIJS because she did not think it had a likelihood of success due to the guardianship appearing to be primarily for the purpose of receiving immigration status and not protection from abuse. She testified that she tried to withdraw the petition but was unable to do so because Abdoveis had not withdrawn as attorney of record. Her fear was that the potential failure of the SIJS would put at risk any future immigration benefits for Elvira. Abdoveis testified that he was never asked to withdraw from the case and that there is a form G-28 wherein another attorney can file to represent someone in an immigration case without a withdrawal of the previous attorney. The evidence at the PRT hearing reflected that it was quickly apparent after meeting with Elvira that she was a victim of trafficking which would have opened a better channel for her to receive immigration benefits rather than attempt the SIJS. Sherman's affidavit reflects they made this determination within one-half hour of meeting with Elvira and she had been practicing immigration law much less than Abdoveis. Mortazavi and Sherman are both currently helping Elvira with her immigration matters by explaining to USCIS Abdoveis' misconduct so that it will not affect Elvria's pursuit of a trafficking visa.

¶13 Elvira does not speak English and did not appear to understand what was being done in her case. Upon review of the record, we hold the OBA proved by clear and convincing evidence that Abdoveis violated Rule 1.4, ORPC by not keeping his client reasonably informed and by not reasonably consulting with his client. Elvira appears to have been a victim of trafficking and had she been reasonably consulted a more successful path to immigration benefits would have been available to her. However, it is not clear from the record that Abdoveis acted without diligence in violation of Rule 1.3, ORPC. It appears he met with Elvira and her brother, filed a guardianship, and then pursued her I-360 petition with USCIS. It was not until after he resigned from Catholic Charities that the USCIS informed them that it needed more information. In addition, we do not find that the record proves by clear and convincing evidence that Abdoveis violated Rule 1.1, ORPC, by not providing competent representation. The record shows he pursued an SIJS benefit rather than one based upon trafficking. Although it seems clear from the record the SIJS was not the best route to take, we do not find it establishes incompetence. The emergency guardianship order was at least partially based on neglect as defined in the Oklahoma Statutes and not solely based upon receiving immigration benefits. It is up to the USCIS to determine on what grounds the SIJS was primarily pursued.[17] Nor do we find Abdoveis violated Rule 3.3, ORPC. It is not clear from the briefs how this Rule is alleged to have been violated other than the argument Abdoveis pursued an SIJS on shaky grounds. Technically, Elvira's parents were not providing an appropriate education for her under Oklahoma's definition of neglect, even though it would seem doubtful that that alone would support the granting of SIJS.[18] Therefore, we do not find the OBA established by clear and convincing evidence that the attached emergency guardianship order constituted a false statement of fact to a tribunal in violation of Rule 3.3, ORPC. In light of this and the counter arguments concerning the impact of Abdoveis not withdrawing from the SIJS case, it is not clear from the record that Abdoveis violated Rule 8.4 (d), ORPC nor is it clear how he violated Rule 1.3, RGDP, in regards to Count II of the Complaint.

3. Count III of the Complaint (Pacheco Grievance).

¶14 Reynoldo Pacheco fled abuse from Honduras and entered this country in February 2019. He sought asylum and consulted with Abdoveis at Catholic Charities in December 2019. Abdoveis then filed Pacheco's asylum application in January 2020. Coulter testified that the filing of the asylum application in January 2020 met the one-year filing deadline. A hearing was set for February 26, 2020, before the United States Department of Justice, Executive Office for Immigration Review, Immigration Court, Dallas, Texas. Pacheco testified that the "first court" gave them more documents that would need to be completed and Abdoveis told him they would meet in two months and see how the paperwork was going. Pacheco proceeded to contact Abdoveis over the next six months but Abdoveis would not answer his calls and Pacheco did not have any contact with Abdoveis. Abdoveis testified he had no doubt that Pacheco's allegations were true but he did not recall not following up with Pacheco. Coulter testified the USCIS rejected Pacheco's asylum case. After Abdoveis resigned from Catholic Charities in July 2021, Catholic Charities met with Pacheco and gave him his paperwork. He testified Catholic Charities could no longer represent him due to the now existing conflict of interest. Coulter believed Pacheco's best path forward would be to pursue an ineffective assistance of counsel claim related to his asylum case.

¶15 Abdoveis admitted that some of the paperwork was missing when he filed the asylum application and he admitted that he neglected to resubmit the application following his knowledge of the defects.[19] He believed that, had it been re-filed timely, Pacheco would have been able to proceed with the asylum application. However, because it had not been timely re-filed, Pacheco would have to pursue either a "Lozada motion" or a "withholding of removal" which does not allow all the benefits he would have received under asylum. Abdoveis believed Pacheco was pursuing a "Lozada motion" with other attorneys but the OBA interjected that Pacheco had not done so because he has had difficulty finding representation. Pacheco also testified that he was having difficulty finding a lawyer to represent him because of the difficulty of the case caused by Abdoveis not re-filing or correcting the asylum petition. At the PRT hearing, Pacheco's interpreter stated that Pacheco was currently representing himself and was allowed to file the petition. The University of Tulsa Legal Clinic helped Pacheco file the papers but they are not currently representing Pacheco.

¶16 The Complaint alleges Abdoveis' actions in Count III constitute professional misconduct in violation of Rules 1.3, 1.4 and 8.4(d), ORPC and Rule 1.3, RGDP. As to Rules 1.3 and 1.4, OPRC, we hold the OBA has established by clear and convincing evidence that Abdoveis was not diligent in his representation of Pacheco and did not reasonably communicate with him. As to Rule 1.3, RGDP, we hold the OBA has also established by clear and convincing evidence that Abdoveis' conduct brings discredit to the legal profession. If this was the only matter where Abdoveis had failed to file or re-file a matter timely we might not be persuaded. However, it amounts to a continuation of what we have seen in Count I of the Complaint of a pattern of delaying or not filing gravely important matters on behalf of his clients. Such action brings discredit upon the legal profession. However, unlike Count I of the Complaint, the alleged facts in this count are not the same as the repeated lying and even the fabrication of a false document which we hold in Count I of this opinion to constitute misconduct that is prejudicial to the administration of justice in violation of Rule 8.4(d), ORPC. There is not much explanation as to why Abdoveis' misconduct in Count III of the Complaint amounts to the serious interference contemplated by this provision. See State ex rel. Oklahoma Bar Ass'n v. Bourne, 1994 OK 78, ¶¶9-10, 880 P.2d 360, 362-363. In Bourne we noted:

In the following cases, the conduct of the respective respondents has been found to be prejudicial to the administration of justice: State ex rel. Oklahoma Bar Ass'n v. Sopher, 852 P.2d 707 (Okla. 1993) (Attorney received a public reprimand for making unwelcomed sexual advances to his client and his client's mother. Both parties agreed that the attorney's behavior violated Rule 8.4[d].); State ex rel. Oklahoma Bar Ass'n v. Downing, 863 P.2d 1111 (Okla. 1993) (Attorney was disbarred for various acts. The Court held that Rule 8.4 was violated by his failure to file a motion to withdraw from cases after suspension for prior misconduct.); State ex rel. Oklahoma Bar Ass'n v. Lacoste, 813 P.2d 501 (Okla. 1991) (Attorney was given a one year suspension for presenting a check on behalf of his client to a third party in exchange for documents when the attorney knew he had already put a stop payment on the check at the bank. This misconduct, together with other misconduct, was found to be dishonest and in violation of Rule 8.4(d), among other rules cited.); State ex rel. Oklahoma Bar Ass'n v. Colston, 777 P.2d 920 (Okla. 1989) (Attorney disbarred after having been found to have committed five counts involving neglect and misrepresentation of the status of clients' cases, along with forgery of adversary parties' appearances and fraud in obtaining public officials' signatures. The Court found that DR 1-102(A)(5) was one of the rules violated.); State ex rel. Oklahoma Bar Ass'n v. Moss, 682 P.2d 205 (Okla. 1983) (Attorney disbarred after he paid a client to make a false affidavit to the Bar Association. The attorney further denied the payment when questioned by an investigative officer of the bar. Along with the other rules prohibiting dishonesty, DR 1-102(A)(5) was cited.) State ex rel. Oklahoma Bar Ass'n v. Hensley, 661 P.2d 527 (Okla. 1983) (In a probate proceeding, an attorney told the court she did not know the whereabouts of decedent's son even though she did and was required by law to tell the court. The attorney also counseled her client (decedent's mother) to lie to the court about the decedent's son's address. The attorney was disbarred.); State ex rel. Oklahoma Bar Ass'n v. Cook, 661 P.2d 531 (Okla. 1983) (Judge disbarred after for dishonest conduct including violation of DR 1-102(A)(5). He accepted a plea of guilty and imposed a $500 fine. The judge took control of the $500 and did not turn it over to the court clerk until twenty months after the sentencing date.); State ex rel. Oklahoma Bar Ass'n v. Raskin, 642 P.2d 262 (Okla. 1982) (Attorney disbarred after he deceived his clients, misappropriated and commingled clients' funds and used the funds for his personal use. DR 1-102(A)(5) was one of the rules cited as having been violated.); State ex rel. Oklahoma Bar Ass'n v. Warzyn, 624 P.2d 1068 (Okla. 1981) (Attorney disbarred after he accepted a fee for representation and failed to appear or perform any services for client. While suspended for failure to pay bar dues, the attorney solicited two clients during a visit to a prison and then failed to provide any service for which the clients had paid. The attorney also fraudulently obtained one of the inmate's work checks. DR 1-102 (A)(5) was one of the rules cited as being violated.).

1994 OK 78, ¶9, n.3, 880 P.2d at 362, n.3. Considering the above circumstances wherein this Court has held Rule 8.4(d), and its predecessor, had been violated, we hold the OBA has not established by clear and convincing evidence that Abdoveis' misconduct violated Rule 8.4(d), ORPC, in Count III of the Complaint.

B. Rule Violations on All Counts

¶17 In review of all three counts of the Complaint, we hold the OBA has established by clear and convincing evidence that Abdoveis' misconduct violated Rules 1.3, 1.4, 3.2, 8.4 (c) and (d), ORPC and Rule 1.3, RGDP.

C. Mitigation

¶18 Mitigating circumstances may be considered when assessing the appropriate quantum of discipline. State ex rel. Okla. Bar Ass'n v. McCoy, 2010 OK 67, ¶25, 240 P.3d 675, 684. The major cause of Abdoveis' misconduct appears to be attributed to his caseload. He testified that he was managing anywhere from 650-700 immigration related cases. This overwhelmed him and he asked not to take anymore cases but his request was denied. He asserts in his brief that he was left without much control over his already overwhelming caseload. One factor contributing to his caseload was that Abdoveis did not want to turn down a client that had a good case. Although Abdoveis was able to turn down potential clients, he felt that if a client paid their consulting fee and had a good case it would be wrong not to take the case. He testified that he tried to reduce his caseload by reducing the number of his consultations, but he was not allowed to do this. In its brief, the OBA submits that the number of cases Abdoveis managed was not sustainable nor did it allow an attorney to offer considered advice or have meaningful individual discussion with each client. Besides the overwhelming number of cases he managed, Abdoveis testified he suffered from compassion fatigue or "secondary trauma" from working asylum cases.

¶19 Abdoveis started employment at Catholic Charities less than a year after passing the bar exam. The PRT noted it did not appear he received sufficient training in how to manage his caseload and he was supervised by another attorney, Messerli, who is also facing disciplinary proceedings. Abdoveis testified that, until Coulter arrived, each attorney at Catholic Charities was doing their own thing and there was not much of a case management system.

¶20 Abdoveis is currently in good standing with the bar and there is no evidence of him being the subject of any prior discipline. His brief and testimony expressed his sincere remorse and acceptance of responsibility for his actions. Abdoveis was cooperative with Coulter in auditing his caseload and the OBA investigator testified he was cooperative during the investigation. This Court has previously determined that sincere remorse, acceptance of responsibility and cooperation are factors to be considered when assessing the appropriate measure of discipline. Okla. Bar Ass'n v. Groshon, 2003, OK 112, ¶15, 82 P.3d 99, 106.

D. Discipline

¶21 The factual charges against Abdoveis are deemed admitted and the OBA has presented clear and convincing evidence of the alleged rule violations previously mentioned. Rule 6.4, RGDP; State ex rel. Okla. Bar Ass'n v. Whitebrook, 2010 OK 72, ¶15, 242 P.3d 517, 520-21. This Court determines the appropriate discipline to be administered to preserve public confidence in the bar. State of Oklahoma ex rel. Okla. Bar Ass'n v. Moon, 2012 OK 77, ¶25, 295 P.3d 1, 9. Our responsibility is not to punish but to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts, and of the legal profession. Id. Discipline is imposed to maintain these goals rather than as a punishment for the lawyer's misconduct. State of Oklahoma ex rel. Okla. Bar Ass'n v. Townsend, 2012 OK 44, ¶31, 277 P.3d 1269, 1279. Disciplinary action is also administered to deter the attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts. State of Oklahoma ex rel. Okla. Bar Ass'n v. Pacenza, 2006 OK 23, ¶18, 136 P.3d 616, 625. Discipline is fashioned to coincide with the discipline imposed upon other lawyers for like acts of professional misconduct. State of Oklahoma ex rel. Okla. Bar Ass'n v. Miller, 2020 OK 4, ¶32, 461 P.3d 187, 200. Although this Court strives to be evenhanded and fair in disciplinary matters, discipline must be decided on a case-by-case basis. Id.

¶22 In State ex rel. Okla. Bar Ass'n v. Hulett, 2008 OK 38, ¶17, 183 P.3d 1014, 1019-20, we noted our previous decisions have imposed discipline for neglect of client matters from public censure to two-year suspensions. Public censure has been proper when there have been no affirmative acts of harmful conduct against the client. Id. We determined Hulett's clients had experienced harm due to his neglect and lack of diligence when time was of the essence and the clients did not receive the benefit of their bargain. Id. ¶18, 183 P.3d at 1020. His excuse of being overwhelmed also did not relieve him from performing with reasonable diligence. Id. ¶19, 183 P.3d at 1020. Hulett had also received a previous private reprimand by the PRC and ignored the Bar about certain other grievances. Id. ¶¶21-22, 183 P.3d at 1020. In ruling on a three-month suspension from the practice of law, we noted Hulett had taken remedial steps and the closing of his law office would protect the public. Id. ¶¶25-27, 183 P.3d 1021.

¶23 In State ex rel. Okla. Bar Ass'n v. Loeliger, 2005 OK 79, 127 P.3d 591, Loeliger represented a client in a negligence action after another lawyer had previously dismissed the case without prejudice. Loeliger failed to timely file a petition and misled his client to believe he had filed one by faxing the client a copy of the petition previously filed by the other attorney. Id. ¶7, 127 P.3d at 594. The charade continued with Loeliger paying the client a supposed settlement sum from his personal account in the amount of $7,400.00. Id. ¶8, 127 P.3d at 594. The client was suspicious and conducted his own research wherein he discovered the petition had never been filed. Id. ¶9, 127 P.3d at 594. The client filed a grievance with the OBA. When imposing discipline, we noted that in similar cases we have imposed suspensions of up to two years. Id. ¶22, 127 P.3d at 597. At the PRT hearing Loeliger expressed his remorse and accepted responsibility for his actions. Id. ¶11, 127 P.3d at 595. We ultimately suspended him for sixty-days taking into consideration his lack of prior discipline, the economic harm was not significant to the client, and a death in the family contributed to Loeliger's failing to timely file the petition. Id. ¶23, 127 P.3d at 597.

¶24 In State ex rel. Okla. Bar Ass'n v. Boone, 2016 OK 13, 367 P.3d 509, Boone represented a client in a personal injury matter. Boone failed to adequately communicate with his client and update him on the status of his case. Boone then filed a petition one day after the statute of limitations had run and the case was dismissed. Id. ¶6, 367 P.3d at 512. The client terminated Boone's services and thereafter discovered for the first time that a lawsuit had been filed and had been dismissed as untimely. Id. ¶7, 367 P.3d at 512-13. The client filed a grievance with the OBA. In imposing a six-month suspension this Court noted Boone had two prior private reprimands and exhibited a disturbing pattern of failing to communicate with his clients and neglecting their cases. Id. ¶20, 367 P.3d at 515. Although we did not find he intentionally sought to harm his clients, we found he had ongoing issues with his practice that he failed to correct and another reprimand would not suffice. Id. ¶31, 367 P.3d at 517.

¶25 Two other opinions of this Court deal more specifically with lawyers who fabricate documents in order to deceive their clients. In State ex rel. Okla. Bar Ass'n v. Bolusky, 2001 OK 26, 23 P.3d 268, the OBA filed many counts against Bolusky concerning multiple failures to respond to bar grievances, untruthful statements made in a deposition, lying to clients about the status of their cases, and fabricating a false petition which he presented to his client as evidence he had filed the same. Bolusky candidly admitted his actions at the PRT hearing. Id. ¶32, 23 P.3d at 278. We found Bolusky's dishonesty to be particularly disturbing and stated "[t]his Court is concerned when a lawyer makes misrepresentations to clients . . . . Both clients and courts rely upon the truthfulness of lawyers." Id. Although we noted Bolusky had not been previously disciplined and his conduct did not financially damage his client, his conduct was egregious. Id. This Court suspended him from the practice of law for a period of two years and one day. Id. 

¶26 In State ex rel. Okla. Bar Ass'n v. Thomas, 1995 OK 145, 911 P.2d 907, Thomas failed to timely file his client's workers' compensation Form 9. Instead of informing his client, he lied and told her that her case had been appealed. He then fabricated an order of this Court, with a photocopied file stamp and signature of the Chief Justice, to appear as if it concerned her fictitious appeal. Id. ¶7, 911 P.2d at 910. The order was presented to the client. A bar grievance was filed, and Thomas repeatedly failed to respond to the grievance. Thomas further had to be served with a subpoena duces tecum to appear for depositions and later failed to file a response brief. In imposing discipline this Court was particularly concerned with the fraudulent order. We determined, "the forging of legal documents is a serious breach of legal ethics which constitutes illegal conduct involving moral turpitude and justifies imposition of the most severe discipline." Id. ¶15, 911 P.2d at 913. We held that only disbarment would be appropriate when considering his fraudulent order along with his misrepresentations, client neglect, and his failure to timely respond to the grievance. Id. ¶16, 911 P.2d at 913. Thomas was disbarred.

¶27 In the present case, Abdoveis failed to provide diligent representation and provide reasonable communication with numerous clients. He also made numerous false representations to many clients concerning the filing of their immigration matters. In the case concerning his client M.M.M., he fabricated a document to achieve this deception. It does not appear Abdoveis intentionally wanted to harm his clients and he had compassion for their causes. However, unlike Loeliger, it cannot be said that his clients suffered insignificant economic or other harm because of his misconduct. Clients lost their ability to obtain work authorizations, social security numbers, drivers licenses, and bank accounts, among other things. At the very least, his misconduct created uncertainty of the legal status of his clients for months if not years.

¶28 The PRT recommends Abdoveis be suspended from the practice of law for a period of six months. Like the PRT, we cannot ignore the volume of cases in which Abdoveis committed misconduct. His repeated misrepresentations to his clients concerning the status of their cases and the fabrication of a document to deceive one of his clients is particularly disturbing. We recognize that Abdoveis has had no prior disciplinary incidents and his overwhelming caseload was a very real problem. We also acknowledge his candidness and cooperation with both Catholic Charities and the Oklahoma Bar Association. Testimony at the PRT hearing confirms he is currently working but not in a position where he can likely cause similar harm to any clients. However, due to the number of violations of the Oklahoma Rules of Professional Conduct and the Rules Governing Disciplinary Proceedings, and the type of misconduct, we cannot agree with the recommended discipline. We hold a suspension of Abdoveis' law license for one year from the date of this opinion is appropriate.

IV. ASSESSMENT OF COSTS

¶29 On November 13, 2023, the OBA submitted an Application to Assess Costs of the disciplinary proceedings, totaling $2,746.52. Pursuant to Rule 6.16[20], RGDP, the Respondent is hereby ordered to pay costs in the amount of $2,746.52 within ninety days from the date of this opinion.

V. CONCLUSION

¶30 In the present case, the OBA has established by clear and convincing evidence Abdoveis' professional misconduct. We hold the appropriate discipline is to suspend Abdoveis' law license for a period of one year from the date of this opinion. Abdoveis is further required to pay the assessed costs of $2,746.52 within ninety days from the date of this opinion and to comply with the requirements of Rule 9.1[21], RGDP.

RESPONDENT SUSPENDED FROM THE PRACTICE OF LAW FOR 
ONE YEAR; ORDERED TO PAY COSTS

Winchester, Edmondson, Combs, Gurich, and Darby, JJ., concur;

Rowe, V.C.J., Kauger and Kuehn, JJ., concur in part, dissent in part;

Kauger, J., with whom Rowe, V.C.J. and Kuehn, J., join, concurring in part, dissenting in part: 

"I would follow the recommendation of the PRT."

Kane, C.J., recused.

FOOTNOTES

[1] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 1.3:

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

[2] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 1.1:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

[3] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 1.3:

A lawyer shall act with reasonable diligence and promptness in representing a client.

[4] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 1.4:

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[5] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 3.2:

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

[6] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 3.3:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
(4) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.

(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

[7] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 8.4 (c) and (d):

It is professional misconduct for a lawyer to:

. . . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

[8] Catie Coulter is an attorney and testified she was in an office manager role prior to taking the role of Abdoveis' direct supervisor in October 2020.

[9] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 13.1:

Service of any and all correspondence, notices, and any formal complaint, in connection with proceedings under these Rules, whether before or after the filing of a formal complaint, may be made upon the respondent lawyer or applicant for reinstatement in person or by mail directed to the respondent or applicant at the last address shown on the official roster of the Oklahoma Bar Association, unless and until the respondent or applicant, or counsel for the respondent or applicant, shall cause to be delivered to the General Counsel a notice reflecting a different address. Oklahoma Bar Association members are required to provide a current address to the Association and to inform the Association of any changes in address in accordance with the requirements of the Rules Creating and Controlling the Oklahoma Bar Association. Proof of mailing to the respondent or applicant at such address shall be sufficient to prove service. Except as otherwise specifically provided in these Rules, service may be made by regular mail.

[10] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 6.4:

The respondent shall within twenty (20) days after the mailing of the complaint file an answer with the Chief Justice. The respondent may not challenge the complaint by demurrer or motion. In the event the respondent fails to answer, the charges shall be deemed admitted, except that evidence shall be submitted for the purpose of determining the discipline to be imposed.

[11] The witnesses were: Catie Coulter, the managing attorney at Catholic Charities; Nancy Cardoza, the auditing attorney; Kaitlyn Mortazavi, an attorney at the University of Tulsa Legal Clinic who is helping Elvira Camaja with her immigration case; Kurt Stoner, the OBA Investigator; and, Elvira Camaja and Reynaldo Pacheco, who were former clients of Abdoveis at Catholic Charities.

[12] The exhibits consisted of the three grievances and various responses and replies to those grievances, correspondence between Coulter and the OBA concerning her filed grievance and supplemental cases discovered, correspondence by Coulter with Abdoveis' former clients at Catholic Charities, a fraudulent document drafted by Abdoveis, and a guardianship docket sheet regarding a case Abdoveis filed on behalf of Elvira Camaja.

[13] The PRT made no mention about Rule 3.2, ORPC, in its findings and it also mentioned Rule 8.4 (c) only in the body of its recommendation and not in its section title which listed the various rule violations. The Complaint, however, addressed and alleged Abdoveis violated both rules in addition to the others the PRT found he violated.

[14] Robin Sherman is another attorney at the University of Tulsa Legal Clinic, who, with Kaitlyn Mortazavi, helped Elvira with her immigration matters following her attempt to seek help from Catholic Charities. She declared in her affidavit that there is no such thing as a Juvenile Visa and she determined it was probably a reference to a Special Immigration Juvenile Status. She further declared that a "green card" is a lay person term and refers to a person seeking an adjustment of their status in order to obtain legal permanent resident status.

[15] 8 U.S.C. § 1101 (27)(J)(i):

The term "special immigrant" means--

. . . .

(J) an immigrant who is present in the United States--

(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

See also Matter of D-Y-S-C-, Adopted Decision 2019-02 (AAO Oct. 11, 2019) (Oct. 11, 2019)("Special Immigrant Juvenile (SIJ) classification may only be granted upon the consent of the Secretary of Homeland Security, through U.S. Citizenship and Immigration Services (USCIS), to juveniles who meet all other eligibility criteria and establish that the requisite juvenile court or administrative determinations were sought to gain relief from parental abuse, neglect, abandonment, or a similar basis under state law, and not primarily to obtain an immigration benefit."); Budhathoki v. Nielsen, 898 F.3d 504, 511 n.5 (5th Cir. 2018) ("USCIS policy guidance referenced by the district court has the agency look even more searchingly than we are discussing here. It directs USCIS to decide whether the SIJ benefit was 'sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect [or abandonment.]' USCIS Interoffice Memorandum from William R. Yates, Assoc. Dir. for Operations, to Reg. Dirs. & Dist. Dirs. (May 27, 2004), at 2. Neither the USCIS nor the district court made a finding about 'primary purpose.'").

[16] 10A O.S. Supp. 2020, § 1-1-105 (49)(a)(1):

49. a. "Neglect" means:

(1) the failure or omission to provide any of the following:

(a) adequate nurturance and affection, food, clothing, shelter, sanitation, hygiene, or appropriate education,

[17] At the PRT hearing, Abdoveis testified that he disagreed with Sherman's assessment that Elvira was not eligible for SIJS benefits and it was a legal disagreement between the attorneys. Tr. at 189.

[18] Abdoveis testified "I will agree with her that it may be a bit of a stretch to suggest that because somebody wasn't in school in a poor part of a third world country that that constitutes neglect or abuse, but under Oklahoma state law, it does." Tr. at 192.

[19] Abdoveis testified "Yes. I should have refiled the application shortly after we showed up to court and it was brought to my attention that the application was missing a page." Tr. at 196.

[20] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 6.16:

The costs of investigation, the record, and disciplinary proceedings shall be advanced by the Oklahoma Bar Association (or the Professional Responsibility Commission, if provision therefor has been made in its budget). Where discipline results, the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown. Failure of the disciplined lawyer to pay such costs within ninety (90) days after the Supreme Court's order becomes effective shall result in automatic suspension from the practice of law until further order of the Court.

[21] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 9.1:

When the action of the Supreme Court becomes final, a lawyer who is disbarred or suspended, or who has resigned membership pending disciplinary proceedings, must notify all of the lawyer's clients having legal business then pending within twenty (20) days, by certified mail, of the lawyer's inability to represent them and the necessity for promptly retaining new counsel. If such lawyer is a member of, or associated with, a law firm or professional corporation, such notice shall be given to all clients of the firm or professional corporation, which have legal business then pending with respect to which the disbarred, suspended or resigned lawyer had substantial responsibility. The lawyer shall also file a formal withdrawal as counsel in all cases pending in any tribunal. The lawyer must file, within twenty (20) days, an affidavit with the Commission and with the Clerk of the Supreme Court stating that the lawyer has complied with the provisions of this Rule, together with a list of the clients so notified and a list of all other State and Federal courts and administrative agencies before which the lawyer is admitted to practice. Proof of substantial compliance by the lawyer with this Rule 9.1 shall be a condition precedent to any petition for reinstatement.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1989 OK 74, 777 P.2d 920, 
State ex rel. Oklahoma Bar Ass'n v. Colston
Cited

 
1991 OK 51, 813 P.2d 501, 62 OBJ 1781, 
State ex rel. Oklahoma Bar Ass'n v. Lacoste
Cited

 
1993 OK 44, 863 P.2d 1111, 64 OBJ 1193, 
State ex rel. Oklahoma Bar Ass'n v. Downing
Cited

 
1993 OK 55, 852 P.2d 707, 64 OBJ 1345, 
State ex rel. Oklahoma Bar Ass'n v. Sopher
Cited

 
2001 OK 26, 23 P.3d 268, 72 OBJ 832, 
STATE ex. rel. OKLAHOMA BAR ASSN. v. BOLUSKY
Discussed at Length

 
1994 OK 78, 880 P.2d 360, 65 OBJ 2227, 
State ex rel. Oklahoma Bar Ass'n v. Bourne
Discussed at Length

 
1995 OK 25, 895 P.2d 707, 66 OBJ 1108, 
State ex rel. Oklahoma Bar Assn. v. Holden
Discussed

 
1995 OK 106, 914 P.2d 644, 66 OBJ 3187, 
State ex rel. Oklahoma Bar Assn. v. Eakin
Discussed

 
1995 OK 145, 911 P.2d 907, 66 OBJ 3991, 
State ex rel. Oklahoma Bar Assn. v. Thomas
Discussed

 
2003 OK 112, 82 P.3d 99, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GROSHON, JR.
Cited

 
2005 OK 79, 127 P.3d 591, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. LOELIGER
Discussed at Length

 
2006 OK 23, 136 P.3d 616, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. PACENZA
Discussed

 
2008 OK 38, 183 P.3d 1014, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HULETT
Discussed

 
2009 OK 31, 212 P.3d 1186, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. KINSEY
Discussed

 
2010 OK 67, 240 P.3d 675, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. McCOY
Discussed

 
2010 OK 72, 242 P.3d 517, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. WHITEBOOK
Discussed

 
2012 OK 44, 277 P.3d 1269, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TOWNSEND
Discussed

 
2012 OK 77, 295 P.3d 1, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MOON
Discussed

 
2016 OK 13, 367 P.3d 509, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. BOONE
Discussed

 
2020 OK 4, 461 P.3d 187, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MILLER
Discussed

 
2023 OK 27, 527 P.3d 708, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. CLARK
Discussed

 
1981 OK 23, 624 P.2d 1068, 
State ex rel. Oklahoma Bar Ass'n v. Warzyn
Cited

 
1982 OK 39, 642 P.2d 262, 
State, ex rel., Oklahoma Bar Ass'n v. Raskin
Cited

 
1983 OK 32, 661 P.2d 527, 
State ex rel. Oklahoma Bar Ass'n v. Hensley
Cited

 
1983 OK 33, 661 P.2d 531, 
State ex rel. Oklahoma Bar Ass'n v. Cook
Cited

 
1983 OK 104, 682 P.2d 205, 
State ex rel. Oklahoma Bar Ass'n v. Moss
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA